## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 31 2020, 9:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Anthony C. Lawrence
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of Parental Rights of M.C., Mother, N.J., Father, and Z.J., Child,

N.J.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

August 31, 2020

Court of Appeals Case No. 20A-JT-427

Appeal from the
Madison Circuit Court

The Honorable
G. George Pancol, Judge

Trial Court Cause No.
48C02-1910-JT-260

**Kirsch, Judge.**

[1] N.J. ("Father") appeals the juvenile court's order terminating his parental rights to his minor child, Z.J. ("Child").[1] Father raises the following restated issue on appeal: whether the juvenile court's judgment terminating his parental rights was supported by clear and convincing evidence.

[2] We affirm.

## Facts and Procedural History

[3] Mother and N.J. ("Father") (together, "Parents") are the biological parents of Child. *Appellant's App. Vol. II* at 39. On July 3, 2017, Child was born positive for THC, and medical personnel observed that he was experiencing drug withdrawal symptoms. *Ex. Vol.* at 3; *Tr.* at 14. At that time, Child presented with tremors, vomiting, and stiff joints. *Appellant's App. Vol. II* at 27. On July 6 and 13, 2017, both Mother and Father tested positive for THC. *Id*. Child was not removed from Parents' home at this point. *Id*.

[4] On October 11, 2017, Mother had a fight with Father, punching him multiple times in the head and stomach and throwing household items at him, and she threatened to physically harm Child. *Id*. at 28. Law enforcement were called

---

[1] The juvenile court also terminated Mother's parental rights in the same order. Although Mother does not join in Father's appeal, she previously filed an appeal of the termination order, and we resolve her appeal in a companion case filed with the present case on this date.

and twice ordered Mother to leave the home and threatened her with arrest if she returned. *Id*. On October 12, 2017, Indiana Department of Child Services ("DCS") attempted to set up a safety plan with Parents, but Parents continued to argue and were unable to agree on a satisfactory plan. *Id*. When a safety plan could not be agreed upon, Child was removed from the Parents' home on that date and placed in foster care. *Id*.

[5] On October 13, 2017, DCS filed a petition alleging that Child was a child in need of services ("CHINS"), and the juvenile court authorized the petition. *Ex. Vol.* at 42. On the same date, the juvenile court held an initial hearing, advised Parents of the material allegations in the CHINS petition, and appointed separate legal counsel for each of the Parents. *Id*. at 40. On October 18, 2017, Mother admitted that Child was a CHINS, acknowledging "that the child did test positive for THC at the time of birth and services could be beneficial." *Id*. at 38. Both Mother and Father waived a fact-finding hearing, and the juvenile court adjudicated Child to be a CHINS under Indiana Code section 31-34-1-1. *Id*.

[6] On November 15, 2017, the juvenile court held the dispositional hearing, and ordered Mother and Father into reunification services. *Id*. at 33-37. Among the general requirements under the dispositional decree, Parents were ordered to obey the law, visit Child on a regular basis, care for Child, maintain adequate housing and a means of legal income, and abstain from drug use. *Id*. at 34-36. Parents were also ordered to fulfill the following specific requirements: participate in individual counseling and follow all recommendations;

participate in family counseling and follow all recommendations; cooperate with home-based services; complete a drug and alcohol assessment and follow all recommendations; submit to random drug screens upon request of DCS; successfully complete parenting classes; attend AA/NA on a regular basis, secure a sponsor, and provide verification of attendance; complete an anger management assessment and follow all recommendations; maintain consistent contact with DCS and inform DCS of any change in address within forty-eight hours; and participate in and successfully complete any recommendations of any domestic violence assessments or programs. *Id*. at 34-37. Mother was also ordered to participate in a batterer's intervention program. *Id*. at 35.

[7] On April 2, 2018, the juvenile court held a review hearing and found that Mother and Father had not complied with the Child's case plan. *Ex. Vol.* at 12. Father had completed a substance abuse assessment and had been diagnosed with "Cannabis Use Disorder, moderate; and depression, unspecified." *Id*. at 15. He was recommended for individual therapy two to four times a month. *Id*. Previously, on July 20, 2017, DCS had made a referral for Father to have a substance abuse assessment and treatment at Aspire, but he did not comply at that time. *Id*. at 16. During the time period beginning in October 2017 and continuing to the date of the review hearing, Father tested positive for THC on all drug screens he completed and also tested positive for cocaine, "BZE, and EME" on one occasion. *Id*. at 16. Father failed to show up for drug screens on at least twenty-two occasions. *Id*. During a team meeting prior to the review hearing, Parents had told DCS that they had been having problems completing

their drug screens due to work schedule conflicts, so it was arranged that they could go to a different location; however, they never showed up for their drug screens at the new location and could not be reached at the phone number they had provided. *Id.* At the time of the hearing, Parents had begun working with home-based services, but services were suspended in March 2018 due to multiple no-shows by Parents. *Id.* at 17.

[8] Although Mother had been ordered to participate in domestic violence intervention services, when DCS offered the services to her, she insisted that she had not been ordered to complete such services, even when DCS reminded Mother that domestic violence was one of the reasons why the CHINS case was opened. *Id.* at 17-18 Parents continued to refuse to complete domestic violence intervention services, and Mother denied any relationship problems despite several reports from the service providers that Parents had ongoing relationship issues with Mother becoming very angry and violent in front of Child and Father appearing to instigate arguments occasionally. *Id.* at 18.

[9] Although recommended by DCS, a parenting assessment had not been scheduled at the time of the hearing. *Id.* A service provider observed (1) that Mother played too rough with Child and Father either did not recognize it or failed to ask her to stop, (2) that Mother and Father were overfeeding Child, and (3) that Parents continued to fight in front of Child, suggesting a lack of knowledge of child development. *Id.* It was also found that Parents had failed to maintain contact with DCS and that Parents had been staying in motels and had not notified DCS of their whereabouts. *Id.*

At the time of the review hearing, Parents were not visiting Child regularly. *Id.* at 24. Father had approximately thirty-seven opportunities to visit Child since his removal and had only visited him approximately twenty-three times. *Id.* Father's reasons for the missed visitations included illness and lack of transportation. *Id.*

On September 19, 2018, a permanency hearing was held. The juvenile court found that DCS had provided Parents with several reunification services, but they had failed to comply with Child's case plan. *Id.* at 8-9. Supervised visitations had been suspended in April 2018 due to Parents not showing up. *Id.* at 9. Father had not participated in parenting skills building, had not participated in drug screens or substance abuse treatment since May 2018, had not completed domestic violence programs or psychiatric and medical evaluations, and had not completed home-based casework services. *Id.* The juvenile court changed the permanency plan to adoption concurrent with reunification. *Id.*

On March 6, 2019, the juvenile court held another review hearing. *Id.* at 2-5. At that time, services, supervised visitation, parenting skills building, random drug screens, substance abuse treatment, domestic violence intervention, child and family team meetings, and home-based case work services had been offered to Father. *Id.* at 2. Father had stopped participating in or failed to begin most services by April or May 2018. *Id.* The juvenile court found that Father had not enhanced his parenting abilities and had not cooperated with DCS. *Id.* at 2-

3. Father had stopped visiting Child in April 2018, and eventually, his visitation was cancelled due to "no show[s]." *Id*. at 3.

[13] On October 2, 2019, DCS filed it termination petition. *Appellant's App. Vol. II* at 5-7. On November 6, 2019, the juvenile court held the initial hearing. Mother and Father did not appear because they were living in Louisiana. *Tr*. at 4. The termination fact-finding hearing was held on December 17, 2019. Mother and Father both appeared telephonically and by counsel. *Id*. at 11. At the hearing, Child's court appointed special advocate ("CASA") Kelsey Antrim ("CASA Antrim"), testified and issued her CASA report. *Appellant's App. Vol. II* at 26-35; *Tr*. at 53-54. DCS requested the juvenile court to take judicial notice of the underlying CHINS case. *Tr*. at 55. Mother's counsel did not object, and Father's counsel said the "only objection I have your Honor is that it would be hearsay (INAUDIBLE)." *Id*. The juvenile court noted Father's objection and took judicial notice of the CHINS case. *Id*.

[14] Kelly Wol ("Wol"), a clinical supervision therapist with the Rollins Center, performed a substance abuse evaluation of Father. *Id*. at 31-33. Wol referred Father to substance abuse counseling, but Father participated in only two substance abuse individual sessions and "no showed" for seven sessions. *Id*. at 33, 38. Father's individual services were then terminated. *Id*. at 38-39. Wol was also referred to assist in home-based services with Father but testified that Father never followed through with those services. *Id*. at 39. During his time working with Wol, Father took only one drug screen, which tested positive for

THC. *Id*. at 40. After six months of "non-involvement," all of Father's services at Rollins Center were closed out. *Id*.

[15] FCM Mary Maas ("FCM Maas") started working with Child and Father on July 2, 2017, on the same day Child was born. *Id*. at 13-14. The case began as an informal adjustment due to Child being born drug exposed, and Child was removed from Parents' care on October 12, 2017 due to domestic violence in the home. *Id*. at 15. FCM Maas testified that Child was never returned to Parents' care after being removed in October 2017. *Id*.

[16] Father lacked stability in housing throughout the CHINS case. *Id*. at 17-18. From the time the case began in 2017 through June 2018, Father lived in three or four different locations, including at a motel. *Id*. at 17. Mother and Father moved to Louisiana in June 2018 without informing DCS beforehand. *Id*. Father had also not shown stability in employment over the duration of the case. *Id*. at 18. He never showed FCM Maas any employment verification although he told her that he had worked at a trailer park at one point and a pizza place when Parents lived in Huntington, Indiana. *Id*.

[17] FCM Maas testified that Father's visitation with Child was sporadic with visits stopping and starting and stopping again, due to his noncompliance. *Id*. at 20, 21. Even when people were assigned to drive Father from Huntington to Anderson for visits, he would not answer the door to engage in visits. *Id*. at 20, 21-22. FCM Maas testified that visitations with Child were cancelled due to Father's noncompliance. *Id*. at 20.

[18] FCM Maas further testified that Mother and Father continued to engage in domestic violence even in the presence of services providers. *Id*. at 22. Supervised visits had to be stopped "on a couple of occasions" because they were "fighting" and "created a safety hazard." *Id*. FCM Maas testified that Father never resolved the domestic violence issues. *Id*. at 30. When Father moved to Louisiana in June 2018, he no longer maintained contact with DCS and did not provide any further evidence of participating in services. *Id*. at 22.

[19] FCM Maas reached out to Father "at least weekly" while the case was pending, but Father stopped cooperating with DCS. *Id*. at 23. Due to Father's lack of participation, FCM Maas believed that continuation of Father's parent-child relationship posed a threat to Child's well-being. *Id*. at 24. Father showed no improvement concerning his domestic violence and substance abuse issues. *Id*. Child was doing well in the foster home where he had been placed since he was four weeks old, and FCM Maas opined that it would be "traumatic for him to be removed from foster care." *Id*. FCM Maas further testified that that it was in Child's best interests if Father's parental rights were terminated because Child needed stability, which Parents had not shown. *Id*. Since moving to Louisiana, Father rarely reached out to see how Child was, except for a few texts. He made no phone calls. *Id*. at 24-25. FCM Maas stated that Father had shown "no concerns" for Child since moving to Louisiana. *Id*. at 25.

[20] Since being removed from Parents' care, Child had been living in a pre-adoptive foster home. *Id*. FCM Maas testified that Child was thriving in the foster home

and was very bonded with the foster parent. *Id*. DCS's plan for Child was adoption, and the foster mother was willing to adopt Child. *Id*. at 25, 53.

[21] CASA Antrim testified that Father's "inconsistencies and [his] lack for [sic] showing up for [Child] is a detriment to him and as he gets older will continue to be a detriment." *Id*. at 54. CASA Antrim stated in her report that Mother's services and visitation with Child were closed out in April and May 2018 due to "non-compliance and no shows." *Appellant's App. Vol. II* at 32-33. Although CASA Antrim reached out to Father, he never responded, and she was never able to speak with him. *Tr*. at 54-55. The last time CASA Antrim attempted to contact Father was September 2018. *Appellant's App. Vol. II* at 33. CASA Antrim testified that it would be in Child's best interest for Parents' rights to be terminated and for adoption to occur. *Tr*. at 54.

[22] On January 23, 2020, the juvenile court issued its findings, conclusions, and order, terminating Father's parental rights to Child. *Appellant's App. Vol. II* at 5-24. The juvenile court specifically made the following conclusions:

> 6. There is no reasonable probability that the conditions that resulted in [Child's] removal from and continued placement outside the care and custody of [Parents] will be remedied.
>
> 7. The continued parental relationship between [Father] and [Child] is a danger to [Child's] continued health and well-being.
>
> 8. Termination of the parent-child relationship between [Father] and [Child] is in the best interests of [Child].

9. The plan of the [DCS] for the care and treatment of [Child], that being adoption of [Child], is acceptable and satisfactory.

*Id.* at 24.  Father now appeals.

## Discussion and Decision

[23]     As our Supreme Court has observed, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make.  They are also among the most fact-sensitive -- so we review them with great deference to the trial courts[.]"  *E.M. v. Ind. Dep't of Child Servs.*, 4 N.E.3d 636, 640 (Ind. 2014). The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child and these parental rights are of a constitutional dimension. The law, however, allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005); *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied.*  Parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship.  *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013).  The purpose of terminating parental rights is not to punish the parent but to protect the child.  *In re D.P.*, 994 N.E.2d 1228, 1231 (Ind. Ct. App. 2013).  Termination of parental rights is proper where the child's emotional and physical development is threatened.  *Id.*  The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social

development is permanently impaired before terminating the parent-child relationship. *Id*.

[24] When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id*. Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id*. at 148-49. A judgment is clearly erroneous if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004).

[25] Where, as here, the juvenile court entered specific findings and conclusions, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. A finding is clearly erroneous when the record contains no facts or inferences drawn therefrom that support it. *Id*. If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*.

[26] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases is one of clear and convincing evidence. *In re H.L.*, 915 N.E.2d at 149. Moreover, "if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added).

[27] Father argues that the juvenile court failed to prove by clear and convincing evidence that his parental rights should be terminated and asserts that the evidence was insufficient to support the juvenile court's determinations. Father specifically contends that DCS failed to prove that the conditions resulting in the removal of Child would not be remedied because he at least partially

complied with the case plan and participated in some of the services until services were disrupted due to Parents moving. He maintains that he was not given a meaningful opportunity to complete services after his relocation. Father also claims that DCS failed to prove that continuation of the parent-child relationship posed a threat to the well-being of Child because he was unable to complete services due to work conflicts, and DCS never made any meaningful accommodations to resolve the conflict. Father further argues that DCS failed to prove that termination was in the best interest of Child because Father attempted to be a good parent, had made progress, and at the time of the hearing had a stable home and employment and the ability to do services.

[28]    In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home will not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what conditions led to the child's placement and retention in foster care, and, second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *E.M.*, 4 N.E.3d at 643 (quoting *K.T.K.*, 989 N.E.2d at 1231). Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal

history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *In re D.B.*, 942 N.E.2d 867, 873 (Ind. Ct. App. 2011). In addition, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has the discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *E.M.,* 4 N.E.3d at 643. When determining whether the conditions for the removal would be remedied, the trial court may consider the parent's response to the offers of help. *D.B.,* 942 N.E.2d at 873.

[29] Here, the conditions that led to Child's removal were Parents' substance abuse and domestic violence. *Tr*. at 15. As a result of the CHINS adjudication, Father was ordered to obey the law, visit Child on a regular basis, maintain adequate housing and a means of legal income, abstain from drug use, participate in individual and family counseling and follow all recommendations, cooperate with home-based services, complete a drug and alcohol assessment and follow all recommendations, submit to random drug screens, complete parenting classes, attend AA/NA on a regular basis and secure a sponsor, complete an anger management assessment and follow all recommendations, maintain consistent contact with DCS and inform of any change in address within forty-eight hours, and participate in and successfully complete any recommendations of any domestic violence assessments or

programs. *Ex. Vol.* at 34-37. The evidence presented at the termination hearing showed that Father failed to accomplish many of these objectives.

[30]　After DCS first became involved, Father did an intake for individual therapy but never returned. *Tr.* at 20. Following a substance abuse assessment on January 12, 2018, Father participated in only two of nine scheduled individual sessions for substance abuse treatment. *Id.* at 20-21, 33, 38. During the pendency of the case, Father tested positive for THC on all drug screens he completed and also tested positive for cocaine, "BZE, and EME" on one occasion. *Ex. Vol.* at 16. Father failed to show up for drug screens on at least twenty-two occasions. *Id.* He participated in home-based casework services at the beginning of the case, but the services were cancelled in April 2018 due to his noncompliance. *Tr.* at 21. He participated in supervised visitation with Child, but visitations were stopped when Parents kept moving. Father did not answer the door on at least a couple of occasions when DCS arranged transportation for Parents to attend visitations. *Id.* at 21-22.

[31]　Father contends that he was unable to comply with services because of conflicts with his work hours and "no meaningful accommodations were made to resolve the conflict." *Appellant's Br.* at 13. His request is to reweigh the evidence, which we cannot do. *In re H.L.*, 915 N.E.2d at 149. Further, Father did not submit any documentation supporting his claims about his situation in Louisiana, where he claimed he had a suitable home, stable employment, and would be able to complete services after his work hours lessened. *Appellant's Br.* at 13.

[32] At the termination hearing, FCM Maas testified that Parents' "major barriers for . . . reunification" were noncompliance with services and continued problems with domestic violence and drug use. *Tr.* at 22. She also testified that she had no proof that Parents had completed any services in Louisiana after they moved there without notifying DCS and after all services in Indiana had been terminated. *Id.* at 22. Parents failed to maintain contact with DCS despite being ordered in the dispositional order to "maintain consistent contact with the DCS and inform DCS of any changes in address and phone number within [forty-eight] hours in writing." *Ex. Vol.* at 36. Father also failed to consistently attend visitation with Child, even when he was still living in Indiana. *Tr.* at 21-22. Supervised visitations were suspended in April 2018 due to Parents not showing up, and at the time of the termination hearing in December 2019, Father had not seen Child since he moved to Louisiana in June 2018. *Id.*; *Ex. Vol.* at 9.

[33] The evidence presented at the December 2019 termination hearing established that Father had stopped participating in or failed to begin most services, including substance abuse and domestic violence intervention services, by April 2018 and then moved to Louisiana in June 2018 without informing DCS and failed to complete services in the intervening year and a half. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372

(Ind. Ct. App. 2007), *trans. denied*. Also, as we have recognized, "Even assuming that [the parent] will eventually develop into a suitable parent, we must ask how much longer [the child] should have to wait to enjoy the permanency that is essential to her development and overall well-being." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied*. We, therefore, conclude that the juvenile court's conclusion that there was a reasonable probability Father would not remedy the conditions resulting in Child's continued removal from Father's care was not clearly erroneous.[2]

[34] Father next argues that the juvenile court's conclusion that termination was in the best interest of Child was not supported by clear and convincing evidence. In determining what is in the best interests of the child, a trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.,* 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*), *trans. dismissed.* In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id.* (citing *In re R.S.,* 774 N.E.2d 927, 930 (Ind. Ct.

---

[2] We need not address whether the juvenile court properly concluded that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to Child's well-being because Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *See* Ind. Code § 31-35-2-4(b)(2)(B); *A.D.S. v. Ind. Dep't Child Servs.*, 987 N.E.2d 1150, 1157 n.6 (Ind. Ct. App. 2013), *trans. denied*.

App. 2002), *trans. denied*). A parent's historical inability to provide a suitable, stable home environment along with the parent's current inability to do so supports a finding that termination is in the best interests of the child. *In re A.P.* 981 N.E.2d 75, 82 (Ind. Ct. App. 2012). Testimony of the service providers, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re A.S.,* 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*.

[35] A juvenile court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re A.K.*, 924 N.E.2d at 224. Additionally, a child's need for permanency is an important consideration in determining the best interests of a child. *Id*. (citing *McBride v. Monroe Cty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)). At the time of the termination hearing, Child had been removed from Father's care for over two years and since Child was four months old, and Father had failed to make the changes in his life necessary to provide Child with a safe and healthy environment. As discussed above, DCS presented sufficient evidence that there was a reasonable probability that Father would not remedy the reasons for Child's removal from his care. Additionally, both FCM Maas and CASA Antrim testified that it was in Child's best interests for Father's parental rights to be terminated. *Tr*. at 24, 54. FCM Maas recommended termination because Child needed stability, which Father had not shown, and since moving to

Louisiana, Father had shown no concerns for Child. *Id*. at 24-25. CASA Antrim testified that termination would be in Child's best interests because Father's "inconsistencies and [his] lack for [sic] showing up for [Child] is a detriment to him and as he gets older will continue to be a detriment." *Id*. at 54.

[36] Father has not provided any evidence other than his own testimony regarding why he was not able to participate in services that would have addressed his substance abuse and domestic violence issues. On appeal, he claims that he "attempted to be a good parent, had made progress, and now had a stable home and employment and the ability to do services." *Appellant's Br*. at 14. However, the evidence presented showed that Father failed to maintain contact with DCS throughout the duration of the case and never communicated any proof of his alleged changed circumstances. The failure to effectively use the services provided by DCS supports the conclusion that termination of Father's parental rights was in Child's best interests. *See In re S.S.*, 120 N.E.3d 605, 613 (Ind. Ct. App. 2019).

[37] Father maintains that permanency in and of itself is not a valid basis for termination of parental rights, but the need for a permanent home is an important consideration when determining what is in the best interest of a child. *K.T.K.*, 989 N.E.2d at 1235. At the time of the termination hearing, it had been over two years since DCS removed Child from Parents' care, and Father failed to show that he was in a better position to be able to provide Child with a permanent and stable environment than when the case begun. Even

assuming that Father will eventually develop into an appropriate caregiver, Child should not have to wait any longer for the opportunity to enjoy the permanency that is essential to his development and overall well-being. The juvenile court's conclusion that termination of Father's parental rights was in Child's best interests was supported by sufficient evidence.

[38] Based on the record before us, we cannot say that the juvenile court's termination of Father's parental rights to Child was clearly erroneous. We affirm the juvenile court's judgment.

[39] Affirmed.

Pyle, J., and Tavitas, J., concur.

.